IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JONATHAN F. BOOTH,                        *

        Plaintiff,                        *

        v.                                *          Civil Action No. RDB 05-1972

MARYLAND DEPARTMENT OF                     *
PUBLIC SAFETY & CORRECTIONAL
SERVICES, *et al.*,                        *

        Defendants.                       *

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

MEMORANDUM OPINION

This action arises out of a Complaint that Plaintiff Jonathan Booth ("Plaintiff" or

"Booth") filed against the Maryland Department of Public Safety and Correctional Services (the

"Department") and Warden James Peguese (collectively, "Defendants") under 42 U.S.C. § 1983,

state contractual law, and Article 36 of the Maryland Declaration of Rights.[1]  Plaintiff is a

member of the Rastafarian religion and wears dreadlocks, which Rastafari regard as "a sign of

their African identity, and a religious vow of their separation from the wider society."  (Compl.¶

10.)  Plaintiff contends that Defendants violated his rights under the Free Exercise Clause of the

First Amendment to the United States Constitution by demoting and then terminating Plaintiff

for refusal to remove his dreadlocks.  Pending before this Court is Defendants' Motion to

Dismiss, or in the Alternative, for Summary Judgment.  This Court has jurisdiction pursuant to

28 U.S.C. § 1331.  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2004).  For the

---

[1]  Warden Peguese is sued in his official and individual capacities.  (*See* Compl. ¶ 5.)

reasons that follow, Defendants' Motion to Dismiss, or in the Alternative, for Summary

Judgment is GRANTED-IN-PART and DENIED-IN-PART.

<u>BACKGROUND</u>

**I.    Plaintiff's Prior Litigation.**

On January 3, 2002, Booth brought two suits against the State of Maryland and five

Department employees—one in the Circuit Court for Baltimore City and one in this Court—"to

enjoin certain disciplinary action taken against Jonathan Booth by the State of Maryland for

failure to remove his dreadlocks and conform with the grooming policy in force at that time."

(Compl. ¶ 12.)  *See generally Booth v. Maryland*, 207 F. Supp. 2d 394 (D. Md. 2002), *aff'd in*

*part and rev'd in part*, 327 F.3d 377 (4th Cir. 2003).

In his 2002 suits, Booth asserted the following causes of action: defamation, violations of

42 U.S.C. §§ 1983 and 1981, and violations of Articles 24 and 36 of the Maryland Declaration of

Rights.  *See Booth*, 207 F. Supp. 2d at 396.  Booth asserted that the defendants violated 42

U.S.C. § 1983 by infringing upon Booth's rights under the Free Exercise Clause of the First

Amendment to the United States Constitution.  Specifically, Booth objected to disciplinary

action taken against him for failure to comply with the Department's grooming policy and the

Department's alleged refusal to accommodate Booth's religious beliefs.  *Id*. at 397.  Booth also

claimed that the defendants subjected him to "racially disparate discipline" in violation of 42

U.S.C. § 1983.  *Id*. at 399.

On June 2, 2002, Judge Motz of this Court granted summary judgment to the defendants

on all counts.  Judge Motz determined that the grooming policy furthered the defendants'

legitimate interests of "public safety, discipline and esprit de corps" and passed rationality

review under *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872 (1990).  *See*

*Booth*, 207 F. Supp. 2d at 398.  In the *Smith* decision, the Supreme Court found that the Free

Exercise Clause is not violated when "neutral, generally applicable" laws have "an incidental

effect on religious practice" as long as there is a rational basis for the restriction.  *Smith*, 494

U.S. at 878-79.

On April 30, 2003, the United States Court of Appeals for the Fourth Circuit remanded

the case for further proceedings based on evidence that the defendants might have violated §

1983 by enforcing the grooming policy in a discriminatory manner.  *See generally Booth v.*

*Maryland*, 327 F.3d 377 (4th Cir. 2003).  Although the Fourth Circuit agreed with the District

Court's holding that the grooming rule was rationally related to the defendants' legitimate

interests, it reversed the District Court's determination that Title VII preempted Booth's claim

under § 1983 claim that the grooming policy had been applied in a discriminatory manner.  *Id*. at

381.  Instead, the Fourth Circuit found that "Title VII does not preclude a public sector employee

from bringing a § 1983 action based on alleged violations of the Equal Protection Clause."  *Id*. at

382 (citing *Keller v. Prince George's County*, 827 F.2d 952 (4th Cir. 1987)).

On May 19, 2004, the parties settled.  A letter memorializing the settlement agreement

between Booth and the State of Maryland ("Settlement Agreement") indicates that:

> Mr. Booth will be promoted from Correctional Officer II to
> Correctional Officer III, effective September 1, 2003.  Mr. Booth will
> be transferred from the Division of Pretrial Detention and Services
> ("DPDS") to the Division of Correction ("DOC"), preferably to a
> facility within the Baltimore region.
>
> Mr. Booth will receive a religious accommodation to dress code
> policy of the Department of Public Safety and Correctional Services
> ('the Department').  The Department agrees that it will not retaliate
> against Mr. Booth for filing the above referenced lawsuits in any

fashion.

This agreement does not prevent, in any way, the Department from otherwise disciplining Mr. Booth if he engages in misconduct under Department's Standards of Conduct or under the Code of Maryland Regulations governing misconduct of state personnel. This agreement also does not preclude the DOC from assigning Mr. Booth to any shift or any appropriate post within its correctional facilities.

(Compl., Ex. A-2 p. 1-2; *see also* Compl. ¶¶ 12-13.)

## II.    The Present Dispute.

In February of 2004, consistent with the terms of the Settlement Agreement, Plaintiff was transferred to the Maryland House of Corrections Annex in Jessup, Maryland, where he served as a Correctional Officer Sergeant.  (*See* Compl. ¶ 14.)  On March 17, 2004, Plaintiff applied for a Lieutenant position but was told that he would not be eligible to apply for the position until March 24, 2005.  (*See* Pl. Affidavit ¶ 10.)

On July 1, 2004, prior to his eligibility date, Booth was designated as an acting Correctional Officer Lieutenant.[2]  (*See* Pl. Affidavit ¶ 11.)  Plaintiff believed that he would "hold this position until the next Lieutenant's Test," which is a qualifying exam for the Lieutenant position.  (Pl.'s Affidavit ¶ 11.)  On November 17, 2004, before taking the Lieutenant's exam,

---

[2]  The parties dispute whether Plaintiff's appointment to Correctional Officer Lieutenant was a promotion.  Although Plaintiff alleges that he was promoted, Defendants contend that:

[i]n order to be considered for promotion to Lieutenant, an employee was required to take the Correctional Lieutenant's exam and score best qualified.  Because Plaintiff had not taken the Correctional Lieutenant's exam, he was not eligible to be a Lieutenant.

(Mem. Supp. Defs.' Mot. Dismiss p. 3 (citing Peguese's Affidavit ¶ 5).)  Plaintiff's "Counseling Record", dated October 12, 2004, indicates that Plaintiff, at least for purposes of that document, was classified as a Lieutenant. (*See* Peguese Affidavit, Attach. C.)

4

Booth contends that he "was demoted to Correctional Officer Sergeant." (Pl.'s Mem. Supp. Opp. p. 2.) Specifically, Plaintiff asserts that Peguese took away his promotion because Booth refused to remove his dreadlocks. (*See* Compl. ¶ 16.) Defendants contest that Plaintiff was "demoted" on the theory that "Plaintiff was never promoted to a Correctional Officer Lieutenant so he could not be demoted from the position." (Defs.' Mem. Supp. Mot. Dismiss p. 11.)

On January 30, 2005, Plaintiff requested a meeting with Warden Peguese "to discuss several security issues." (Pl.'s Mem. Supp. Opp. p. 2.) On February 4, 2005, Plaintiff met with Warden Peguese. During this meeting, Plaintiff alleges that he expressed the need to "open cell doors to feed inmates because many cell feed slots were inoperable. Defendant Peguese did not object to the practice or indicate that it was improper." (Pl.'s Mem. Supp. Opp. p. 2.)

Plaintiff and Peguese also discussed the possibility of Booth returning to the Lieutenant position. According to Booth's affidavit:

> Warden Peguese stated that sometimes you can win the battle but lose the war. He further stated that I may have gotten to wear my hair the way that I want, but the Secretary (Department of Public Safety and Correctional Services) will never accept me as one of her Supervisors, or Sergeants for that matter, and that the Secretary does not want any of her Supervisors wearing anything but short hair cuts.
> * * *
> Defendant Peguese further stated why don't I come into the fold, that he used to wear a bush haircut and a Van Dyke, but found that he could do more "damage" from the inside. . . . Defendant Peguese further stated that I would not be accepted by the Division as long as my hair was like that, . . . . He further stated that I would not even have made Sergeant here . . . with my hair that way. Defendant then told me to go home and think about what he said.

(Pl.'s Affidavit ¶ 16, 18.) Following this meeting, Plaintiff e-mailed Peguese, offering to wear a hat that would "not draw attention to" his dreadlocks and asking for Peguese's advice. (*See* Pl.'s Opp., Ex. E.) Peguese responded by stating ". . . the decision is yours." (Pl.'s Opp., Ex. F.)

Plaintiff continued to wear his dreadlocks.

During February 2005, Peguese put the facility on "lock down status," during which inmates were allowed out of their cells only for certain privileges, and were "to be served their meals in their cells, through their food slots." (Peguese Affidavit ¶ 7.) On March 1, 2005, an inmate died of unknown causes in the middle of the night and was discovered the next morning. (*See* Compl. ¶ 18.) Booth was the Officer in Charge at the time the inmate died. (*See* Peguese Affidavit, Attach. D ("Report of Sergeant Tonya Leonard").) According to Booth, on the night of the inmate's death:

> Plaintiff was delivering breakfast to the prisoners in Building F, which was under Plaintiff's command. Because many of the meal delivery slots on the cells were broken, Plaintiff opened the cell doors and placed the meal in the cell on a chair. Plaintiff observed the decedent watching television and did not recognize that the prisoner had died.

(Compl. ¶ 18.)

The Maryland House of Correction Annex conducted an investigation following the inmate's death. On March 2, 2005, Sergeant Tonya Leonard issued a report on her investigation. (*See* Report of Sergeant Tonya Leonard.) According to her report, Plaintiff "made several rounds" on the night of the inmate's death and the inmate always appeared "to be watching television." (*Id*.) The report's finding of facts states:

> Sergeant Jonathan Booth made several rounds on the wing and noticed [the] Inmate [] in the same position watching television, he even open[ed] his door to serve[] him breakfast and never attempted to check on the Inmate to see if he was al[]right, Also Sgt. Booth breach[ed] security by giv[ing] the Control Center Officer a[n] order to open (5) five doors at a time considering during Lock-Down we feed the Inmate through the slots. . . . After reviewing the facts, I believe that Sergeant Jonathan Booth . . . violated DPSCS Standard of Conduct.

(*Id.* at 7.)

On March 8, 2005, the Department held a Pre-Disciplinary Mitigation Conference with Booth. According to the record of the mitigation conference, the following individuals were present: Plaintiff, the Assistant Warden, Security Chief, Captain, Lieutenant, and Personnel Officer. (*See* Peguese Affidavit, Attach. F.) The following allegations were addressed at the Mitigation Conference:

> That Sergeant Booth had breached security, neglected his duties, circumvented procedures when the institution was on lock down status. He failed to assure why the inmate did not get up when the food was brought in. The inmate had expired and rigor mortis had already set in when a COI from the next shift at approximately 8:15 am discovered that something was not right and contacted her supervisor who immediately came to the cell and started CPR and 911 was called. The inmate had already expired sometime in that morning. By not following procedures Sergeant Booth neglected to realize that the inmate had expired sometime during his shift. That he had 3 officers in the wing and 5 doors open when the institution was on lock down represents breach of security. That he did not use the feed up slots and that doors were open without searching inmates for weapons.

(Peguese Affidavit, Attach. F.)

Warden Peguese also met with Plaintiff to discuss the inmate's death, and offered Booth a choice between a demotion and termination. (*See* Pl. Affidavit ¶ 28.) Booth refused the demotion "because I had not violated any regulations." (*See* Pl. Affidavit ¶ 28.) According to the "Notice of Termination":

> [Although Booth was] charged with breach of security, insubordination and neglect of his duties, Warden Peguese offered him a lesser disciplinary [sic] in lieu of termination to which he declined to accept. Sergeant Booth immediately displayed an insolent attitude. He abruptly stood up, yanked his rank pin off his uniform and started to proceed to leave the Warden's office. The

>Warden ordered him to sit and calm down until he was told that the conference was over. Trust is a fundamental requirement of his position and Sergeant Booth can no longer be trusted. He chose to be terminated, therefore I am recommending his termination from State Service.

(Peguese Affidavit, Attach. G p. 2.) Booth was charged with insubordination as a result of his actions during the meeting with Warden Peguese. (*See* Compl. ¶ 21.) Plaintiff alleges that this accusation was brought in "further retaliation" and "without reasonable basis." (Compl. ¶ 21.)

On March 17, 2005, Booth was terminated for violating the State Personnel and Pensions Article of the Maryland Annotated Code, the Code of Maryland Regulations and the Department's Standards of Professional Conduct. (Defs,' Mem. Supp. Mot. Dismiss p. 5.) Booth contests, however, that he violated any regulations and alleges that "Defendants' reasons for Plaintiff's termination are spurious and contrived, and were made by Defendant Peguese's true intent to punish and retaliate against the Plaintiff for his failure to remove his dreadlocks, and in further retaliation for the filing of the earlier action to enforce his First Amendment rights."[3] (Compl. ¶ 20.)

Booth appealed his termination and a hearing was held in front of Administrative Judge

---

[3] Plaintiff supports his retaliation claim with a number of allegations. For example, Plaintiff contends that "[t]he opening of 4 to 5 cell doors during the feeding of inmates was common and accepted during the lock down . . . ." and Peguese had approved this practice during their February 4, 2005 meeting "because many feed slots were inoperable." (Pl. Affidavit ¶¶ 21, 24.) Plaintiff also highlights his clean work record prior to this incident: "In over ten years of service with the Department of Corrections, I have never been disciplined in connection with any work or performance issues." (Pl. Affidavit ¶ 22.) Finally, Booth contends that Defendants did not discipline similarly situated individuals who committed comparable violations. (*See* Compl. ¶ 22.) He asserts that four officers who like Booth observed the inmate during the shift when he died were nonetheless not disciplined. (*See* Pl. Affidavit ¶25.) In response, Defendants submitted evidence that two other officers left their positions as a result of the inmate's death. (*See* Peguese Affidavit, Attach. E.)

Veronica P. Jones on August 23, 2005.  (*See* Peguese Affidavit, Attach. I p. 2.)  The hearing

included sixteen witnesses and resulted in a twenty-eight page opinion.[4]  (*See* Peguese Affidavit,

Attach. I.)  Judge Jones found that the evidence supported the Department's determination that

Booth committed violations of unsatisfactory job performance, insubordination, and

inattentiveness or negligence in the performing of duty.  (Peguese Affidavit, Attach. I p. 27.)

Judge Jones then dismissed the charge of "breach of security resulting in escape or the

immediate possibility of escape," because "in the instant case, there was neither an inmate

escape nor any evidence to suggest an immediate possibility of such an escape."  (Peguese

Affidavit, Attach. I p. 27.)  Finally, Judge Jones concluded that Plaintiff's termination was

proper.[5]  (*See* Peguese Affidavit, Attach. I p. 28.)

## III.   Procedural History.

On May 13, 2005, Plaintiff filed a Complaint with the Circuit Court for Baltimore City.

(*See* Defs.' Opp. Pl.'s Mot. Remand, Ex. 3.)  Plaintiff's Complaint contains three causes of

action: In Count I, Plaintiff contends that Defendants violated 42 U.S.C. § 1983 by infringing on

Plaintiff's rights under the Free Exercise Clause to the First Amendment of the United States

Constitution, and seeks two million dollars in compensatory damages and two million dollars in

punitive damages; in Count II, Plaintiff alleges the Department breached the Settlement

---

[4]  The opinion does not discuss the claims raised by Plaintiff in this case.  (*See* Peguese
Affidavit, Attach. I.)  Moreover, Defendants claim that Plaintiff did not raise the causes of action
asserted in this case at any point during the administrative process.  (*See* Defs.' Mem. Supp.
Mot. Dismiss pp. 11-12.)  Plaintiff has not contested this assertion.

[5]  On January 23, 2006, Booth filed a petition for judicial review of the administrative
judge's decision.  (*See* Pl.'s Opp. p. 6.)  This Court has received no further update on this
petition and proceeds on the assumption that it remains pending.

Agreement, and seeks $500,000 in compensatory damages and $500,000 in punitive damages;

finally, in Count III, Plaintiff contends that Defendants violated Article 36 of the Maryland

Declaration of Rights, and seeks two million dollars in compensatory damages and two million

dollars in punitive damages (Count III).[6]  (*See* Compl. ¶¶ 25-35.)  On July 20, 2005, Defendants

filed a Notice of Removal, asserting the existence of a federal question as the basis of this

Court's jurisdiction.[7]  (*See* Notice, Paper No. 1.)  On January 5, 2006, Defendants filed their

Motion to Dismiss, or in the Alternative, for Summary Judgment.

<u>STANDARD OF REVIEW</u>

Defendants seek to dismiss this action under Rules 12(b)(1) and 12(b)(6) of the Federal

Rules of Civil Procedure.  Motions to dismiss for lack of subject matter jurisdiction are decided

under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  "The plaintiff bears the burden of

proving that subject matter jurisdiction properly exists in the federal court."  *Biktasheva v. Red*

---

[6] Plaintiff's Complaint contains references to rights under the Fourth and Fourteenth Amendments to the United States Constitution.  (*See*, *e.g.*, Compl., Intro (suggesting that this action is brought "pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights, privileges, and immunities secured by the Fourth and Fourteenth Amendments. . . .").)  The specific causes of action asserted by Plaintiff, however, do not reference the Fourth or Fourteenth Amendment.  (*See* Compl. ¶¶ 25-35.)  There is no indication that Plaintiff intends to assert any cause of action under 42 U.S.C. § 1983 other than the alleged violation of his rights under the Free Exercise Clause, as that clause is incorporated into the Due Process Clause of the Fourteenth Amendment.  *See Gitlow v. People of State of New York*, 268 U.S. 652, 666 (1925) (recognizing that the First Amendment applies to states through the due process clause of the Fourteenth Amendment); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996) (same).

[7] On August 19, 2005, Plaintiff moved to have the case remanded, arguing that the petition for removal had been untimely filed pursuant to 28 U.S.C. § 1446(b).  Defendants responded that they had filed their Notice of Removal within the thirty-day statutory period.  On September 21, 2005, this Court denied Plaintiff's Motion to Remand.  (*See* Paper No. 12.)  On September 29, 2005, Plaintiff filed a Motion for Reconsideration.  On December 6, 2005, this Court denied Plaintiff's Motion for Reconsideration.  (*See* Paper No. 22.)

*Square Sports, Inc.*, 366 F. Supp. 2d 289, 294 (D. Md. 2005). The court may "consider evidence outside the pleadings" in a 12(b)(1) motion to determine if it has jurisdiction over the case. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). "The court should grant the 12(b)(1) motion only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Biktasheva*, 366 F. Supp. 2d at 294 (quoting *Richmond*, 945 F.2d at 768).

Defendants seek to dismiss Plaintiff's breach of contract claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. When the legal sufficiency of a complaint is challenged under Rule 12(b)(6), the court assumes "the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Eastern Shore Mkts. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). A Rule 12(b)(6) motion to dismiss "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325 (4th Cir. 2001); *see also Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). Furthermore, the "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Rather, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal*, 248 F.3d at 325-26; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)). However, while "notice pleading requires

generosity in interpreting a plaintiff's complaint . . . generosity is not fantasy." *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 191 (4th Cir. 1998).

In reviewing the complaint, the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman*, 417 F.3d at 420; *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The court must disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969). However, in considering a motion to dismiss, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments" nor "the legal conclusions drawn from the facts." *Eastern Shore Mkts., Inc.,* 213 F.3d at 180; *see also Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 329 F. Supp. 2d 574, 578 (D. Md. 2004).

<u>DISCUSSION</u>

## I.    Plaintiff's Federal Claim (Count I).

Count I of Booth's Complaint alleges that Defendants violated 42 U.S.C. § 1983 by failing "to provide the Plaintiff with a reasonable accommodation to wear dreadlocks on the basis of his religious belief."[8]  (Compl. ¶ 26.)  In particular, Plaintiff contends that he was demoted from Lieutenant to Sergeant because he refused to remove his dreadlocks, and that his

---

[8]  42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . .

termination "was in direct retaliation for Plaintiff's failure to remove his dreadlocks."  (Compl. ¶¶ 27-28.)  Plaintiff also alleges that Defendants' actions "were done with malice and demonstrate a deliberate indifference to Plaintiff's federally protected rights."  (Compl. ¶ 29.)

Defendants make three arguments with respect to Count I:  First, Defendants' argue that the Court lacks subject matter jurisdiction over Plaintiff's claim against the Department because the Department, as a state agency, is not subject to civil liability under 42 U.S.C. § 1983.  (*See* Defs.' Mem. Supp. Mot. Dismiss pp. 7-8.)  Second, Defendants contend that the Department and Warden Peguese enjoy immunity under the Eleventh Amendment and doctrine of sovereign immunity.  (*See* Defs.' Mem. Supp. Mot. Dismiss p. 8.)  Third, Defendants argue that Warden Peguese is entitled to qualified immunity because he did not violate any clearly established constitutional rights.  (*See* Defs.' Mem. Supp. Mot. Dismiss p. 9.)

Before addressing the substantive arguments summarized above, this Court notes that Plaintiff apparently did not raise any First Amendment arguments during the appeal of his termination.  Plaintiff has not challenged Defendants' contention that Plaintiff did not raise the causes of action asserted in this case at any point during the administrative process associated with his appeal.  (*See* Defs.' Mem. Supp. Mot. Dismiss pp. 11-12.)  The opinion issued by Administrative Judge Jones, moreover, does not discuss the causes of action asserted by Plaintiff in this case.  (*See* Peguese Affidavit, Attach. I.)

A.    **"Persons" under 42 U.S.C. § 1983.**

Defendants argue that neither the Department nor Warden Peguese is liable under 42 U.S.C. § 1983 because a State—as well as its agencies and employees—is not a "person" under § 1983.  *See* 42 U.S.C. § 1983 (extending liability to "[e]very *person* who, under color of any

statute . . .subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. . . .") (emphasis added).

It is well-established that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Williams v. Wisconsin*, 336 F.3d 576, 580 (7th Cir. 2003) (Wisconsin's department of corrections and prison officials sued in their official capacity are not "persons" for purposes of prisoner's § 1983 claim); *Chin v. City of Baltimore*, 241 F. Supp. 2d 546, 548 (D. Md. 2003) (recognizing that a state agency is "not a 'person' as the term is used in 42 U.S.C. § 1983."). There is no dispute in this case that the Department is a state agency and that Warden Peguese is a state employee. Accordingly, Plaintiff's 42 U.S.C. § 1983 claim against the Department and Warden Peguese in his official capacity (Count I) is dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[9]

**B.    Qualified Immunity.**

Defendants contend that Warden Peguese in his individual capacity is entitled to qualified immunity with respect to Plaintiff's 42 U.S.C. § 1983 claim because Warden Peguese

---

[9]  In light of this Court's decision that neither the Department nor Warden Peguese in his official capacity are "persons" under § 1983, this Court does not reach Defendant's argument with respect to the Eleventh Amendment and doctrine of sovereign immunity. *See Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 482-83 (4th Cir. 2005) (noting that when a defendant asserts "*both* that the federal statute at issue does not permit a suit against the State *and* if not, that Eleventh Amendment immunity bars the suit . . . not only is the statutory question logically antecedent to the existence of the Eleventh Amendment question, but also there is no realistic possibility that addressing the statutory question will expand the court's power beyond the limits that the jurisdictional restriction has imposed.") (citing *Vermont Agency of Nat. Res. v. United States*, 529 U.S. 765, 778 (2000)).

did not violate any "clearly established" right of which a reasonable person would have known.

(*See* Defs.' Mem. Supp. Mot. Dismiss p. 9.)

> The United States Court of Appeals for the Fourth Circuit has explained that:

>> Government officials are entitled to the defense of qualified immunity unless a § 1983 claim satisfies the following two-prong test (the "qualified immunity test"): (1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a "clearly established" right "of which a reasonable person would have known."

*Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (citations omitted).  Applying the qualified immunity test to the instant case, this Court notes that Plaintiff appears to have at least identified the right allegedly violated with sufficient particularity.  (*See* Pl.'s Mem. Supp. Opp. p. 12 (discussing "the right to dress and wear one's hair in conformance with one's religious beliefs.").)  *See also Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (". . . [T]he right the official is alleged to have violated must have been 'clearly established' in a [] particularized, and hence [] relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

Neither Plaintiff nor Defendants address the first prong of the qualified immunity test, which involves determining whether the allegations underlying Plaintiff's claim would, if true, substantiate the violation of a federal statutory or constitutional right.  Instead, the parties focus exclusively on the second prong of the qualified immunity test, which involves determining whether, at the time of the Defendants' alleged conduct, the right at issue was a clearly established one of which a reasonable person would have known.  (*See* Defs' Mem. Supp. Mot. Dismiss pp. 9-10; Pl.'s Mem. Supp. Opp. pp. 10-12.)  For the reasons that follow, Plaintiff's claim fails to satisfy at least the second prong, and therefore Warden Peguese is entitled to

qualified immunity.

Defendants contend that the right at issue in this case—*i.e.*, the right to dress and wear one's hair in conformance with one's religious beliefs— was not "clearly established" when the alleged violations occurred.  (*See* Defs' Mem. Supp. Mot. Dismiss pp. 9-10.)  A law is "clearly established" when "the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'"  *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (quoting *Wallace v. King*, 626 F.2d 1157, 1161 (4th Cir. 1980)).  Plaintiff has failed to identify any authority of any kind to support his contention that the right to dress and wear one's hair in conformance with one's religious beliefs was clearly established at the relevant time.[10]  This Court's independent research, moreover, has likewise identified no such authority.  As a result, this Court concludes that the alleged violations in this case were *not* of a "clearly established" right of which a reasonable person would have known.  Accordingly, Warden Peguese is entitled to qualified immunity and Plaintiff's § 1983 claim against Warden Peguese in his individual capacity (Count I) is DISMISSED under Fed. R. Civ. P. 12(b)(6).[11]

---

[10]  Plaintiff could have, but did not, argue that his right to wear dreadlocks is established by the Settlement Agreement.  (*See* Compl., Ex. A-2. p. 1 ("Mr. Booth will receive a religious accommodation to dress code policy of the Department of Public Safety and Correctional Services ('the Department')."))  Contractual rights, however, generally do not give rise to claims under 42 U.S.C. § 1983.  *Cf. Coastland Corp. v. County of Currituck,* 734 F.2d 175, 178 (4th Cir. 1984) (noting that "'[a] mere breach of contractual right is not a deprivation of property without *constitutional* due process of law . . . . Otherwise, virtually every controversy involving an alleged breach of contract by a government . . . would be a constitutional case.'" ) (emphasis in original) (quoting *Medina Jimenez v. Almodovar*, 650 F.2d 363, 370 (1st Cir. 1981)).

[11]  Plaintiff's Complaint alleges that "[d]efendant's actions were done with malice and demonstrate a deliberate indifference to Plaintiff's federally protected rights." (Compl. ¶ 29.) Allegations of malice, however, are insufficient to defeat the defense of qualified immunity.  *See*

## II.     Plaintiff's State Claims

Although Plaintiff's federal claim in Count I is dismissed, this Court may exercise supplemental jurisdiction over Plaintiff's remaining state claims, Counts II and III, pursuant to its discretionary powers under 28 U.S.C. § 1367. "[F]ederal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away." *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995); *Arbaugh v. Y & H Corp.*, ___ U.S. ___, 126 S. Ct. 1235, 1244-45 (2006) ("[W]hen a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over pendent state-law claims."). After considering the relevant factors, this Court finds that convenience, fairness to the parties, and considerations of judicial economy, weigh in favor of retaining jurisdiction over Plaintiff's state claims.

### A.     Breach of Contract (Count II).

Defendants contend that Plaintiff's breach of contract claim should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (*See* Defs.' Mem. Supp. Mot. Dismiss pp. 10-12.) In the alternative, Defendants request that this Court consider matters outside the pleadings, treat their motion to dismiss as one for summary judgment, and grant judgment in Defendants' favor with respect to Plaintiff's breach of contract claim. (*See* Defs.' Reply p. 9.)

The Settlement Agreement between Plaintiff and the State of Maryland provides that:

---

*Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense."); *see also Altman v. City of High Point, N.C.*, 330 F.3d 194, 213 (4th Cir. 2003) (same).

> Mr. Booth will receive a religious accommodation to dress code
> policy of the Department of Public Safety and Correctional Services
> ('the Department').  The Department agrees that it will not retaliate
> against Mr. Booth for filing the above referenced lawsuits in any
> fashion.

(Compl., Ex. A-2.)  Plaintiff's Complaint contains factual allegations that, if true, would support

a claim for breach of contract.  For example, Plaintiff alleges that "Defendant Peguese sought to

have Plaintiff, Jonathan Booth, remove his dreadlocks.  When the Plaintiff, in deference to his

religious beliefs, refused to do so, on November 17, 2004, Defendant Peguese took away

Plaintiff's promotion and demoted him back to Correctional Officer Sergeant."  (Compl. ¶ 16.)

Plaintiff also alleges that "Defendants' true reasons for Plaintiff's termination are spurious and

contrived, and were made by Defendant Peguese's true intent to punish and retaliate against the

Plaintiff for his failure to remove his dreadlocks, and in further retaliation for the filing of the

earlier action to enforce his first Amendment Rights."[12]  (Compl. ¶ 20.)   Accepting all

allegations in Plaintiff's Complaint as true, this Court cannot conclude that Plaintiff is unable to

prove any set of facts in support of his breach of contract claim entitling him to relief.

Accordingly, Defendants' Motion to Dismiss Count II of Plaintiff's Complaint is DENIED.

*Migdal*, 248 F.3d at 325.

---

[12]  Plaintiff also notes in an affidavit that, during his February 2005 meeting with Warden
Peguese:

> Warden Peguese stated that sometimes you can win the battle but lose
> the war.  He further stated that I may have gotten to wear my hair the
> way that I want, but the Secretary (Department of Public Safety and
> Correctional Services) will never accept me as one of her
> Supervisors, or Sergeants for that matter, and that the Secretary does
> not want any of her Supervisors wearing anything but short hair cuts.

(Pl.'s Affidavit ¶ 16.)

Defendants also move for summary judgment with respect to Plaintiff's breach of contract claim.  In this regard, Defendants submit an affidavit from Warden Peguese that addresses the factual allegations contained in Plaintiff's Complaint.  For example, Warden Peguese explains that Plaintiff was not promoted to the position of Lieutenant because "[i]n order to be considered for promotion to Lieutenant, an employee is required to take the Correctional Lieutenant's exam and score best qualified.  Because Mr. Booth had not taken the Correctional Lieutenant's exam, he was not eligible to be a Lieutenant."  (Peguese Affidavit ¶ 5.) Warden Peguese also states that "I did not terminate Mr. Booth for failure to remove his dreadlocks."  (*Id.* at ¶ 9.)  Instead, Warden Peguese explains that his "recommendation to terminate Mr. Booth was because he engaged in intentional conduct, without justification, which seriously threatened the safety of the workplace."  (*Id.*)  Finally, Warden Peguese attaches a number of documents to his affidavit to establish that Plaintiff was terminated for reasons unrelated to his dreadlocks or the prior lawsuit.  (*See* Peguese Affidavit, Attach. D (Report of Sergeant Tonya Leonard); Attach. G (Notice of Termination); Attach. I (Memorandum Opinion of Judge Jones).)

Discovery has not commenced in this case.  As a general matter, "summary judgment must be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). The nonmoving party, however, "cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery."  *Evans v. Techs. Apps. & Service Co.*, 80 F.3d 954, 961 (4th

Cir.1996).  "If a party believes that more discovery is necessary for it to demonstrate a genuine

issue of material fact, the proper course is to file a Rule 56(f) affidavit stating 'that it could not

properly oppose a motion for summary judgment without a chance to conduct discovery.'"

*Harrods.*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961).  The Fourth Circuit has noted,

however, that if the nonmoving party makes objections to summary judgment that satisfy the

purpose of the affidavit and has not been lax in discovery, the court may order further discovery

without the affidavit. *Id*. at 244-45.

This Court is unwilling to treat Defendants' motion to dismiss as one for summary

judgment at this early stage.  First, although Plaintiff has not submitted an affidavit under Fed. R.

Civ. P. 56(f), Plaintiff indicated in his opposition brief that he "needs to investigate and explore,

through discovery, the breach of the Settlement Agreement and the extent to which the disparate

treatment of Plaintiff was motivated by animosity toward his hairstyle, his religions, and the

earlier Settlement Agreement."  (*See* Pl.'s Mem. Supp. Opp. p. 15.)  Second, issues of fact may

exist with respect to the motivation behind Plaintiff's reassignment to the position of Sergeant

and termination.[13]  (*See*, *e.g.*, Pl.'s Affidavit ¶ 16 (alleging that Warden Peguese stated that "the

Secretary (Department of Public Safety and Correctional Services) will never accept me as one

of her Supervisors, or Sergeants for that matter, and that the Secretary does not want any of her

---

[13]  Although Plaintiff does not assert claims under Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), this Court notes that Plaintiff's breach of contract
claim is similar in certain respects to a Title VII retaliation claim.  *See Burlington N. & S. F. R.
Co. v. White*, 548 U.S. ___, No. 05-259, slip op. (2006).  In this recent opinion, the Supreme
Court held that a retaliation claim may proceed under Title VII if there is a showing "that a
reasonable employee would have found the challenged action materially adverse, which in this
context means it well might have dissuaded a reasonable worker from making or supporting a
charge of discrimination."  *Id*. at 13 (citations and internal quotation marks omitted).

Supervisors wearing anything but short hair cuts.).)  Accordingly, Defendants' Motion for

Summary Judgement with respect to Count II of Plaintiffs' Complaint is DENIED.[14]

**B.    Article 36 of the Maryland Declaration of Rights (Count III).**

Defendants contend that Plaintiff's cause of action under Article 36 of the Maryland

Declaration of Rights should be dismissed for the following reasons:[15]

> The Court should dismiss Plaintiff's claim under Article 36 of the
> Maryland Declaration of Rights for the same reasons why it should
> dismiss Plaintiff's § 1983 claims under the First Amendment.  At
> least one member of this Court has held that Article 36 does not
> provide a private right of action for damages.  *See Baird v. Haith*, 724
> F. Supp. 367, 384 (D. Md. 1988).  Thus, Count Three of the
> Complaint against Warden Peguese should be dismissed.

(Defs.' Mem. Supp. Mot. Dismiss p. 10.)  Although Plaintiff did not respond to these arguments,

Defendants' analysis of Article 36 of the Maryland Declaration of Rights is incorrect.  First,

causes of action under the Maryland Declaration of Rights are not always subject to the same

analysis as causes of action under 42 U.S.C. § 1983.  In this case, for example, the argument that

disposed of Plaintiff's § 1983 claim against the Department and Warden Peguese in his official

---

[14]  By allowing discovery to commence, this Court is not ruling that all the discovery
requested by Plaintiff in his opposition brief is appropriate. The parameters of discovery will be
determined at a later stage in the litigation.

[15]  Article 36 of the Maryland Declaration of Rights provides in relevant part:

> That as it is the duty of every man to worship God in such manner as
> he thinks most acceptable to Him, all persons are equally entitled to
> protection in their religious liberty; wherefore, no person ought by
> any law to be molested in his person or estate, on account of his
> religious persuasion, or profession, or for his religious practice,
> unless, under the color of religion, he shall disturb the good order,
> peace or safety of the State, or shall infringe the laws of morality, or
> injure others in their natural, civil or religious rights . . . .

capacity does not apply in the context of Article 36 of the Maryland Declaration of Rights. *See* Discussion § I.A, *supra* (finding that the Department and Warden Peguese in his official capacity are not "persons" for § 1983 purposes). Similarly, the argument that disposed of Plaintiff's § 1983 claim against Warden Peguese in his individual capacity also does not apply in the context of the Maryland Declaration of Rights. *See*, *e.g.*, *Okwa v. Harper*, 757 A.2d 118, 140 (Md. 2000) ("At the onset we note some of the features that distinguish an action for damages brought for violations of Article 24 from one brought under § 1983. A state public official alleged to have violated Article 24, or *any* article of the Maryland Declaration of Rights, is not entitled to qualified immunity.") (emphasis added).

The opinion of the Court of Appeals of Maryland in *Okwa v. Harper* addressed a cause of action under Article 24 of the Maryland Declaration of Rights, that court has not specifically addressed Article 36 and the question of qualified immunity. *See* 757 A.2d 118. As Judge Motz of this Court has previously noted, "it is not clear that Maryland law provides a private right of action for damages under [Article 36]." *Booth*, 207 F. Supp. 2d at 400 (D. Md. 2002) (citing *Baird*, 724 F. Supp. at 384). Accordingly, in the *Booth* opinion, Judge Motz provided alternative grounds for dismissing Plaintiff's First Amendment claims against the Department and its employees. *Id.* No such alternative grounds have been identified by Defendants in this matter.

In this case, the Plaintiff does not assert a private right of action.[16] Instead, Plaintiff's claims are against the Maryland Department of Public Safety and Correctional Services (the "Department") and Warden James Peguese. As this Court has already noted, moreover, there is

---

[16]     Accordingly, this Court need not address the question whether Article 36 of the Maryland Declaration of Rights provides a private right of action for damages.

no dispute that the Department is a state agency and that Warden Peguese is a state employee. *See* DISCUSSION § I.A, *supra*. Finally, although Plaintiff has sued Warden Peguese in both his official and individual capacities, Maryland does not follow "the federally recognized distinction between official and individual capacity actions." *Okwa v. Harper*, 757 A.2d 118, 140 (Md. 2000). As a result, there is no basis for dismissing Plaintiff's cause of action under Article 36 of the Maryland Declaration of Rights against Warden Peguese in his individual capacity. *See generally Ritchie v. Donnelly*, 597 A.2d 432, 445 (Md. 1991) (discussing liability for damages resulting from unconstitutional acts).

For the reasons stated above, Defendants' motion to dismiss Plaintiff's cause of action under Article 36 of the Maryland Declaration of Rights (Count III) is DENIED.

<u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, is GRANTED with respect to Count I and DENIED with respect to Counts II and III. A separate Order follows.


July 7, 2006                                   /s/_____
                                              Richard D. Bennett
                                              United States District Judge

23